Unsealed 7/15/08 KM(MD)

ORDERED SEALED BY COURT

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

FILED
05 SEP 16 AM 9:56
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

In the Matter of the Search of

4881 Orchard Avenue (MD)
San Diego, California

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

**CASE NUMBER:** '05 mg 1483

I, Bruce Barron, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation and have reason to believe that on the property or premises known as:

See Attachment A

in the Southern District of California there is now concealed a certain person or property, namely:

See Attachment B

which is:

Evidence, fruits of crime, property designed for use or used in committing criminal offenses including violations of Title 18, United States Code, Sections 1343, 1028A, 1029, and 1030. The facts to support a finding of Probable Cause are as follows:

See attached Affidavit of Bruce Barron continued on the attached sheet and made a part hereof. _X_ Yes ______ No

[signature]
BRUCE BARRON
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence
September 16, 2005 at San Diego, California:

[signature]
HON. RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

The search premises are located at 4881 Orchard Ave., San Diego, California. The premises are described as a single-family, detached home, two stories in height, with the numbers "4881" posted by the white front door. The primary exterior color is a subdued reddish-orange. There is a small front yard that contains various shrubbery.

# ATTACHMENT B

Authorization is sought to search for the evidence that Michael Laude stole trade secret information and data from Qualcomm, Inc. and used that information and data to benefit himself and Nokia Inc. in violation of 18 U.S.C. 1832. Authorization to search includes any detached structures from the primary premises if such additional structures exist.. The authorization includes the search of electronic data to include deleted data, remnant data and slack space. The seizure and search of computers and computer media will be conducted in accordance with paragraphs 29 through 34 of the affidavit submitted in support of this warrant. Evidence to be seized includes but is not limited to:

a. All temporary and permanent files and records of any kind relating to Qualcomm, including but not limited to source code, files obtained from the Qualcomm computers and storage systems, and other computer and non-computer files and records constituting Qualcomm data, content, programs, and business information;

b. All temporary and permanent files and records of any kind, including computer code, computer logs and documents reflecting activities and connections between computers used by Michael Laude or located at the search premises and Qualcomm's computer systems.;

c. All temporary and permanent files and records of any kind reflecting or relating to Nokia business information, including but not limited to source code, files obtained from Nokia computers and storage systems, and other computer files constituting Nokia data, content, programs, and business information;

d. All records and documents that identify the dominion and control of Internet services at the search premises.

AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Bruce Barron, being duly sworn, state the following:

**INTRODUCTION**

1. I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since 1995. I am currently assigned to the FBI's San Diego Division. My primary investigative assignment is the misuse of computers and computer networks in violation of federal laws, including computer intrusions and fraudulent activity facilitated by the use of computers.

2. I have conducted many investigations of high-technology crimes and have been the affiant on several federal and state search warrants arising out of the misuse of computers. I have received extensive specialized training on computer operating systems and networks from professional organizations, commercial vendors, and law enforcement organizations including the FBI. I also provide formal instruction on computer crime matters to law enforcement officers and agents at law enforcement academies and facilities.

**PURPOSE OF THIS AFFIDAVIT**

3. This affidavit seeks the issuance of a search warrant to search the residence of Michael E. Laude, located at 4881 Orchard Ave., San Diego, California as more fully described in Attachment A. The search will be conducted for instrumentalities and evidence of violations of Title 18, United States Code, Section 1832, Theft of Trade Secrets, as more fully described in Attachment B.

**RELEVANT STATUTE**

4. Title 18, United States Code, Section 1832 provides:

"(a) Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of the trade secret, knowingly--

(1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or

> deception obtains such information;
>
> (2) without authorization, copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
>
> * * *
>
> shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both."

**SOURCES OF INFORMATION CONTAINED IN THIS AFFIDAVIT**

5. I make this affidavit based upon personal knowledge and upon conversations with and communications from others who have personal knowledge of the events and circumstances described in this affidavit. In particular, I and other FBI personnel have spoken with and met several times with employees of the victim in this matter, Qualcomm, Inc. These Qualcomm employees have included engineers, information technology security employees, and general corporate security personnel. They have provided information through verbal discussions, printed records, and electronic records. I have relied upon their information and information and analysis provided to me by other agents and computer scientists employed by the FBI.

**PROBABLE CAUSE AND DETAILS OF THE INVESTIGATION**

6. As more fully explained below, there is probable cause to believe that Micheal E. Laude, in the last few months of his employment as an engineer with Qualcomm, Inc., copied hundreds of thousands of files containing the source code for Qualcomm products to his home computer and then used some of those files to create a competing product at his new employer, Nokia.

7. Qualcomm, Inc., is a large, publicly-traded high-technology company that specializes in wireless communications products and services for voice, data, and general Internet services. Qualcomm is headquartered in San Diego, California, and has approximately 8,000 employees worldwide. The core business of the company is the development and licensing of wireless

technology systems, programs, and methodologies, and those business models depend upon patents and proprietary computer source code. The company is best known for its Code-Division Multiple Access (CDMA) technology, a "third generation" wireless communications standard for voice and data. Companies such as Verizon Wireless, Motorola and others, license CDMA technology from Qualcomm to run cellular telephones that they, in turn sell to their customers.

8. CDMA technology can be viewed as similar to the operating system of a computer. It requires compatible hardware and software for the cellular telephone to have functionality. Qualcomm also has created other products and technologies designed to run on top of the CDMA core, much like Microsoft created Microsoft Office to run on top of the Windows operating system, so that phones and other mobile devices using CDMA can have additional functionality. Qualcomm developed a technology called "BREW", Binary Runtime Environment for Wireless, which is a software platform compatible with CDMA, that software developers, including third party developers, can use to create CDMA compatible functionality for their phones. BREW is used for mobile subscriber services such as text messaging, downloading ring tones, and downloading games. Qualcomm also created a program called the Brew Distribution System ("BDS") which provides a vehicle for developers who have created an application for CDMA devices using BREW to sell those applications through Qualcomm. At issue here is the source code for BDS.

9. In October 2004, several Qualcomm employees attended the Cellular Telecommunications and Internet Association convention. During the convention they visited the trade booth of Nokia, a mobile communications company based in Finland that develops and manufactures mobile handsets and mobile infrastructure equipment. The Nokia booth had a display for a new Nokia product named "Preminet." The Qualcomm engineers who viewed Preminet noticed that Preminet seemed identical to their own BDS.

10. Steve Sprigg, a Qualcomm Senior Vice-President for Engineering and the primary developer of BDS, attended the trade show. Sprigg determined that BDS and Preminet are almost identical products. Both are systems for advertising, deploying, and recognizing revenue related to mobile applications. Preminet and BDS are both used in conjunction with products from third-party

developers for use on mobile devices. BDS provides support for developers of BREW applications and Preminet provides virtually identical support for developers of mobile applications designed with JAVA or SYMBIAN, rather than BREW. The technology underlying Preminet, however, appeared shockingly similar to BDS. Qualcomm has had BDS under continuing and expanding development since the year 2000, with a large development, deployment, and support organization for it. Sprigg, the Qualcomm senior vice-president for engineering, describes BDS as "extremely"difficult to develop as a large scale server technology.

11. Qualcomm employees researched Nokia's development of Preminet. They found, and I have reviewed, an article posted on Nokia's website discussing Preminet. The article, titled: "Interview with Preminet Solution Architect Michael Laude", presented in question and answer format Laude's description of Preminet as a "global content delivery and billing-settlement system." In the article, Laude was credited as having been the architect of Preminet.

12. Qualcomm employees, including but not limited to Sprigg and Mitchell Oliver, the Senior Director for Product Management, were shocked that Laude could be credited by Nokia with developing Preminet. They did not believe that Laude had the technical or strategic skills to develop the Preminet product. Qualcomm initiated a review of Laude's activities at Qualcomm prior to his resignation due to concern that he may have misappropriated Qualcomm's trade secrets in order to develop Preminet.

13. Michael E. Laude was a Qualcomm employee from approximately June 8, 1992, through October 11, 2002. On June 9, 1992, Laude signed an Employee Agreement that contained a section on "Nondisclosure of Confidential Information". The nondisclosure clause specifically forbids the disclosure or post-Qualcomm employment use of any proprietary information. Laude was hired as a staff engineer and received promotions and salary increases until May 21, 2002, when he was formally demoted from an the position of Senior Staff Engineer to that of IT Project Manager-Senior. The demotion included a reduction in salary. Between December 15, 2001 and January 15, 2002, Laude applied for eleven (11) different jobs within Qualcomm. He was not selected for any of them.

14. At no time in his Qualcomm career was Laude assigned as a programmer to the BDS development team. In early 2001, Laude was working on the BDS Operations Guide. To write the guide, Laude interviewed BDS engineers. He then worked as part of a team for the Systems Operations for BDS. During this assignment Laude had no programming responsibilities and no reason to access source code. Laude's supervisor from approximately July 2001 to the time of Laude's resignation in October 2002, was Brent Worden, the Director of Systems Operations for Qualcomm. Laude was assigned on a full-time basis to Worden's team. Worden stated during an interview by the FBI that during the time he supervised Laude there was little or no reason for Laude to access Qualcomm source code.

15. Laude resigned from Qualcomm on October 11, 2002, giving one day's notice by email. At that time he had been using vacation leave for the prior 2.5 weeks. His resignation email, dated October 10, 2002, stated: "Folks, It's been a heck of a lot of fun working with you guys in QIS, but it's time for me to move on. So, Friday, 10/11/2002 will by my last day. Thanks, Mike Laude." Nokia has advised, pursuant to a Grand Jury subpoena, that Michael Laude has been employed at Nokia from October 14, 2002, to the present time. He is employed in Nokia's San Diego offices.

16. Qualcomm's computer source code is stored within a source code management system named Perforce, which is used by Qualcomm engineers and developers. Perforce contains hundreds of thousands of individual source code files. A typical user checks out 20 to 50 files at one time for work usage and then checks the files back into Perforce servers with or without modifications. More than one employee can check out the same file for work needs.

17. On May 5, 2001, Laude created a Perforce account on a Qualcomm workplace computer. He gave the internal Qualcomm computer, owned by Qualcomm, the name of "mlaude-nt". On July 27, 2001, Laude submitted an e-mail request to Dennis Poe, a Qualcomm Senior Engineer overseeing the Perforce servers, asking that Poe "add me as a 'real' perforce user". On August 7, 2001, Laude sent a reminder e-mail to Poe asking him that Poe add Laude as a Perforce user. Poe does not know the exact meaning of Laude's reference to a "real" user, but Laude was

presumably requesting from "read" only rights to "write" access to the files since that would provide Laude with access to almost all Perforce files except for those involved with in third-party contracts with specific conditions limiting access.

18. In February 2002, Laude established an account to remotely access the Perforce servers from the Internet when he was away from the Qualcomm campus and the Qualcomm internal network. The user name he established for the remote access was "mlaude" and he used it to remotely log in to the Perforce server starting on February 16, 2002. On February 2, 2002, Laude set up the account and remotely logged in using the user name of CX244252-A, which, based on my experience, I know to be an identification number for a cable modem. A Grand Jury Subpoena issued to Cox Communications identified CX244252-A as a legacy identification number associated with the Internet service account at Laude's residence and the search site, 4881 Orchard Ave., San Diego, California. The number was assigned to the account (which remains in the name of subscriber Kristen Glass) when the Internet service was provided by an entity named "@Home", which for several years provided Internet service on behalf of Cox Communications.

19. Remote log-in to the Perforce servers through the Internet required specific software and specific procedures to verify the user's identity. The software was needed to create an encrypted connection to the Qualcomm network known as a Virtual Private Network. The remote computer needed to have the correct VPN client software installed. Then, the user was required to authenticate their identity and authorization through the use of three discrete identifiers: 1) A "SecurID" number that changed every 30 seconds and was obtained through a small hardware device, known as a "token", that is issued by Qualcomm to authorized users and that could be kept on a key ring; 2) A user name; and 3) A password. In addition to the authentication process required for a user to log-in remotely, the Qualcomm VPN captured the Internet Protocol (IP) address of the remote computer used to log-in remotely to the Perforce server.

20. The IP address captured by Qualcomm for the remote log-ins by "mlaude" for June 2, 2002, to September 30, 2002, was IP 68.8.78.226. This IP addresses comes within a range of IP addresses assigned to and used by Cox Communications. In response to a Grand Jury subpoena, Cox

responded that it does not now have records identifying the subscribers that were assigned its IP addresses in 2002. However, Cox advised that IP 68.8.78.226 is assigned to its subscribers in the San Diego region. Cox Communications did identify a Cox Internet subscriber using the email address of mlaude@cox.net at 4881 Orchard Ave., San Diego, California. These premises are the search location. It is the residence address provided on Laude's California Driver's License, number C3174900. A vehicle registered to Laude, California license plate 4AVC296, has been observed at the premises. The Cox account is in the name of Kristen Glass, who also is believed to also reside at 4881 Orchard Ave., San Diego, California. The Qualcomm IT staff located emails sent from Laude's Qualcomm email account to mlaude@cox.net during 2002. Laude has been assigned the mlaude@cox.net email address since at least 2002.

21. Qualcomm's Perforce computer records show that Laude copied to his remote computer extraordinary quantities of Qualcomm's source code just before he resigned from Qualcomm. The downloading is done by what Qualcomm calls "synchronization" in which the latest copies of the source code are copied to the user's computer for all files or categories of files selected. From June 2002, through October 2002, Laude was the maximum single copier of the Qualcomm source code within the entire Qualcomm organization. During that period his copying exceeded, by approximately 300 to 400 percent, the next highest individual at Qualcomm. By comparison, Laude's copying of files to his Qualcomm-assigned computer on the Qualcomm premises remained essentially changed between August 2001 and October 2002. In fact, in October 2002 Laude had about 443,662 Qualcomm source files on his remote computer compared to 21,983 files on his workplace computer. The quantity of source code files copied by Laude from the Perforce servers are described here by a table and a graph. The graph, prepared by Qualcomm, shows Laude's activity in comparison to average user activity and the highest downloads by any one particular user at one time.




The following table contains excerpts from the data used to create the chart. It is abbreviated in the interests of savings space.

| Date | Mlaude (remote) | Mlaude-nt (work) | Median-all users | Maximum user |
|---|---|---|---|---|
| 01/02/2002 | n/a | 21,983 | 974 | 178,952 |
| 03/01/2002 | n/a | 21,983 | 209 | 113,235 |
| 05/02/2002 | n/a | 21,983 | 1,123 | 195,242 |
| 06/17/2002 | 334,495 | 21,983 | 1539 | 334,495 |
| 08/07/2002 | 357,875 | 21,983 | 1683 | 357,875 |
| 09/05/2002 | 395,629 | 21,983 | 1716 | 395,629 |
| 10/05/2002 | 443,662 | 21.983 | 1629 | 443,662 |

22. During the course of this investigation Qualcomm has identified the source code copied by Michael Laude. The Perforce file structure is complex and contains several sub-categories, but the top-level categories identify the broad organizational structure for the information. Identified below are the top-level categories of Qualcomm source code stored in the Perforce servers and the number of files within those categories that Laude copied by "synchronizing" his remote computer to those file categories.

| Root Directory | # Of Files | General Description |
|---|---|---|
| Brewery | 43,016 | Key products to support manufacturers and Developers |
| COTS | 10,710 | Basic software building blocks (Common-Off-The-Shelf software) |
| Depot | 303,179 | Product software |
| Microbrew | 77,349 | Source code for outside suppliers and partners |
| Pluto | 2,747 | Government project |
| Windshear | 6,661 | Secure Q-chat |

(The above list is not comprehensive for all of the Perforce directories, but identifies the root

directories where Laude downloaded by synchronizing to his remote computer files from the directories. )

23. Qualcomm believes that there was no job-related reason for Laude to be accessing or downloading any Qualcomm source code during the relevant period, much less downloading the quantity of files that he did covering a variety of Qualcomm products, including BDS.

24. Qualcomm conducted a forensics examination of Laude's Qualcomm workstation. The workstation contained, among other things, several versions of Laude's resume. The resume falsely inflates Laude's formal titles, job positions, work history, and accomplishments. The resume identifies Laude as a Qualcomm Vice-President from January 1999 to the present (undated resume), with a job responsibility change in December 2000, remaining at the Vice-President level. However, Qualcomm's personnel records identify Laude as a senior staff engineer in 1999 and 2000. Laude claims in the resume to: "Built and currently lead QIS Operations group. Built BREW Distribution System (BDS)". These claims, according to Qualcomm, are completely false.

25. There is probable cause to believe that Laude would keep and still has the Qualcomm source code he downloaded to his home computer from the Perforce server. He would need the source code to succeed in his new position at Nokia which he appears to have obtained, at least in part, by fabricating his Qualcomm job titles, responsibilities and successes. Laude would have needed and continues to need to covertly rely upon and review the Qualcomm source code files in order to succeed at Nokia and not raise any suspicions there regarding his qualifications. Laude was described by Nokia as the "Preminet Solution Architect", but his employment record at Qualcomm does not suggest that he could satisfy the demands of that role without relying on some key, covert, source of support, such as the Qualcomm source code files that he browsed and copied to a remote computer shortly before his resignation from Qualcomm. In addition, since the downloaded source code files contain the keys to other Qualcomm technologies, there is probable cause that Laude would keep those files in the event that he decided to change directions within Nokia or move to another competing company.

26. Based on my knowledge, skills, and experience, I know that even if Michael Laude deleted from his home computer some or all of the stolen Qualcomm source code files, computer forensics experts can recover some of the deleted files or useful fragments of the files. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.

27. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

28. I further know that computer users often keep and transfer copies of computer files if the user upgrades or changes to a different computer. This is readily accomplished by using the copying commands and protocols that are included in computer operating systems. Computer users have numerous options for copying and moving the computer data. These options include, but are not limited to, copying the files across a home network, copying the files onto writeable DVDs or CDs, copying the files onto an external hard drive, or removing from the older computer the hard drive and connecting it to the newer machine for access to the files. A user may also keep an older computer for the convenience of access to its files.

## Computer Search Plan

29. The proprietary computer source code files downloaded from Qualcomm cannot be left in Laude's possession and constitute fruits of crime or items otherwise illegally possessed. Consequently, the agents executing this warrant intend to seize all computers and all electronic storage devices, including but not limited to hard disk drives, DVDs, CDs, USB drives, ZIP drives and the like. After being seized, a forensic image will be made of the seized media for analysis. A forensic image is an exact physical copy of the hard drive or other media. It is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. This is in sharp contrast to what transpires when a computer running the common Windows operating system is started, if only to peruse and copy data - data is irretrievably changed and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

30. Special software, methodology and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed" – subjected to a mathematical algorithm to the granularity of $10^{38}$ power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a "hash value" confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

31. After imaging the data offsite, it will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. After determining, through examination and analysis, the nature of the issue preventing viewing the data in any meaningful way, a CFE may need to obtain specialized hardware or software, and train with it, in order to view and analyze the data.

32. Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software is also very tedious. It can take days to properly search a single hard drive for specific data. Laude is a computer-savvy engineer. He may have taken steps to hide the Qualcomm source code from ordinary view. Accordingly, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Consequently, your affiant requests permission to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant.

33. All forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information not within the scope of the warrant. Such information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator so that the investigator can determine whether to seek a further search warrant for the newly uncovered data.

34. The imaging of any seized computer media will be completed within twenty (20) days of seizure. Your affiant agrees that to the extent that any active home computers are seized, the images obtained from those computers will be examined, in a very preliminary manner, within thirty

(30) days of seizure to confirm the presence of Qualcomm source code. If no source code is located during the preliminary review or if the preliminary review does not occur within the prescribed 30 days, the home computer will be returned to its owner and the image will be subject to a thorough forensic analysis to locate data subject to this warrant.

## ITEMS TO BE SEIZED

35. Based on the foregoing, there is probable cause to believe that the following items which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. 1832 will be found at 4881 Orchard Ave., San Diego, California:

a. All temporary and permanent files and records of any kind relating to Qualcomm, including but not limited to source code, files obtained from the Qualcomm computers and storage systems, and other computer and non-computer files and records constituting Qualcomm data, content, programs, and business information;

b. All temporary and permanent files and records of any kind, including computer code, computer logs and documents reflecting activities and connections between computers used by Michael Laude or located at the search premises and Qualcomm's computer systems;

c. All temporary and permanent files and records of any kind reflecting or relating to Nokia business information, including but not limited to source code, files obtained from Nokia computers and storage systems, and other computer files constituting Nokia data, content, programs, and business information;

d. All records and documents that identify the dominion and control of Internet services at the search premises.

## REQUEST FOR SEALING ORDER

36. Based upon the on-going nature of this investigation and because the information sought and items to be seized may contain proprietary information and trade secrets of both Qualcomm and Nokia, your affiant further requests that this affidavit, application, search warrant, and attachments be sealed by this Court.

For the reasons provided here, I respectfully request that the search warrant be issued as set forth above.

Bruce Barron
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
16th day of September, 2005

HONORABLE RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE